IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| Antonio C. Garibaldi,<br>Plaintiff, | )<br>)<br>) | |
| v. | ) | 1:17cv1000 (AJT/TCB) |
| Dr. Villasis and Dr. Haydu,<br>Defendants. | )<br>)<br>)<br>) | |

MEMORANDUM OPINION

Antonio C. Garibaldi, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that he suffered deliberate indifference to his serious medical needs with regard to dental care he received at Virginia Beach Correctional Center ("VBCC"). The matter is presently before the Court on an unopposed Motion for Summary Judgment filed jointly by defendants Juan Villasis, D.D.S., and James Haydu, D.D.S. For the reasons which follow, the Motion for Summary Judgment will be granted.

I. Background

Plaintiff commenced this lawsuit in September, 2017, alleging that dental care provided to him at VBCC by Drs. Villasis and Haydu violated his rights under the Eighth Amendment.[1] Because the initial complaint was not signed, Garibaldi was directed to submit a copy bearing his signature, in accordance with Rule 11, and he submitted a signed Amended Complaint on October 24, 2017. [Dkt. No. 5] Briefly, Garibaldi alleges in the Amended Complaint that in December, 2016, he was placed on antibiotics because one of his teeth had become decayed and infected. Id. §IV p.1. A lump developed over his eye and a medical doctor prescribed a different

---

[1]Plaintiff noticed a change of address to Nottoway Correctional Center in October, 2018. [Dkt. No. 24]

antibiotic. After a day or two Garibaldi noticed he was getting worse and submitted emergency grievances and sick call slips, but he was not seen for several days. During this time he experienced hot flashes, dizziness, nausea, and "feverish feelings," and he "truly thought [he] was going to die in [his] cell." Id. Another inmate told him the bags under his eyes were turning purple, various parts of his face were swollen, and the space between his gums and cheeks were "filled by infectious tissus [sic]." Id. §IV p. 2.

Despite the presence of infection Dr. Villasis extracted the tooth and told Garibaldi that he would continue to receive antibiotics and the hole would close over time. After "weeks" the hole stopped healing before it closed completely, and Garibaldi began to feel water in his nose. Id. §IV p. 3. Dr. Villasis stuffed the hole with gauze and stitched it up, but "weeks later" it still hadn't closed properly so Dr. Villasis administered five shots of a numbing agent that sent pain down the whole right side of Garibaldi's body and did further work to attempt to close the hole. Garibaldi requested to be seen by an oral surgeon but Dr. Villasis said "they don't do that outside medical thing any more." Id. Garibaldi also saw Dr. Haydu, who also denied him oral surgery and "lied" by saying no other treatment was available for Garibaldi's condition. Id. §IV p. 4.[2]

After almost six months the hole at the extraction site had healed to the point that in Garibaldi's view, antibiotics wouldn't help. Id. Garibaldi alleges that food and water would travel up the hole into his sinuses and come out his nose, causing him great pain, discomfort, and elevated blood pressure. Id. Because he "got tired of them denying [him] outside surgery"

---

[2]Garibaldi reports that in March, 2017, he began to feel symptoms akin to those caused by the extraction of his tooth and thought it was an infection, "but it was a piece of a carrot stuck in [his] sinus cavity that came out" when he blew his nose, and the symptoms disappeared "within hours." Compl. §IV p. 3.

2

Garibaldi stopped taking the antibiotics "in hopes to force there [sic] hands for outside treatment [but] it didn't work." Id.

In June, 2017, Garibaldi started to have constant pain in the area of the extraction, which was discolored and "very tender." Id. He asked another inmate who had been called for dental to mention his situation, and two hours later Garibaldi also was called to dental. Id. Dr. Villasis stated that he appeared to have an infection at the extraction site, and he prescribed pain medication but no antibiotics because Garibaldi hadn't taken the antibiotics he previously had been offered. Compl. §IV p. 5. Garibaldi asserts that Dr. Villasis was "trying to punish [him] for not letting him poke around in [his] mouth and standing up for [him]self." Id. Garibaldi filed several sick call requests and grievances in June, 2017, and the medical department confirmed the presence of an infection but said it would have to be treated in the dental department. Id.

When Garibaldi saw Dr. Haydu on June 29, 2017, he received antibiotics and pain medication and was sent to an oral surgeon. Id. §IV p. 6. He had oral surgery in July, 2017. Garibaldi asserts that for most of his eight (8) months at VBCC he had to deal with pain and discomfort due to Dr. Villasis' methods of treatment and "punishment."

Garibaldi filed the instant lawsuit in September, 2017, seeking monetary damages. On April 4, 2018, defendants Villasis and Haydu filed a Motion for Summary Judgment with a supporting memorandum of law and exhibits, and supplied Garibaldi with the notice required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) and Local Civ. R. 7(J). [Dkt. No.19-21] Garibaldi has submitted no response. Accordingly, this matter is now ripe for disposition.

## II. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that there are no genuine, material factual disputes and that it is entitled to judgment based on those facts. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has met its initial burden, the burden shifts to the non-moving party to point out the specific facts which create disputed issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational factfinder to rule for the non-moving party. Matsushita, 475 U.S. at 587.

### III. Undisputed Facts

The following material facts are undisputed.

1. Both defendants are dentists licensed to practice in Virginia. Dr. Villasis obtained his degree in 2002, and Dr. Haydu has maintained a clinical practice in general dentistry since obtaining his degree in 1974. Def. Ex. A ¶1; Ex. B ¶1.

2. Garibaldi was seen for the first time by either defendant on December 6, 2016, when Dr. Villasis prescribed an antibiotic for an infected tooth. Def. Ex. C at 178; Ex. A ¶6.

3. Garibaldi was seen in the medical department by Dr. Abdul Jamaludeen a week later, on December 13, 2016. Dr. Jamaludeen modified Garibaldi's antibiotic regimen but when some swelling near the infected tooth developed a few days later, the original antibiotic prescribed by Dr. Villasis was reinstated. Def. Ex. C at 177-78; Ex. A ¶7.

4. Three days later, on December 16, 2016, Dr. Villasis saw Garibaldi again. Garibaldi requested extraction of the infected tooth, and Dr. Villasis performed the extraction. Def. Ex. A

4

¶19. Prior to the extraction Garibaldi reported that he was feeling better after taking the antibiotics, and his oral swelling had decreased to some extent. Id. ¶ 11; Def. Ex. C at 294.

5. On December 19, 2016, Garibaldi was seen in the medical department regarding a lump that had developed over his eye. Although Garibaldi alleges here that the lump was related to his tooth extraction, Am. Compl. at §IV p. 4, in fact it appeared on the side of his face opposite the site of the extraction and was determined to be cellulitis related to a mole. Def. Ex. A ¶10; Ex. C at 177.

6. Medical records and clinicians' reports supplied by the defendants contain no mention of Garibaldi's alleged symptoms of discolored bags under his eyes, facial swelling, and infected tissue between his gums and cheek.

7. On December 20, 2016, Dr. Villasis saw Garibaldi for complaints of bloody drainage at the extraction site. Garibaldi reported that when he sneezed two days earlier water came out of his nose when he rinsed his mouth. Def. Ex. C at 176. He stated that it had not happened again since that time, and he felt no pain. Id. Dr. Villasis' examination revealed the existence of a barely perceptible passage with no bleeding or drainage, and it was decided that Garibaldi should continue the previously-prescribed antibiotics and pain medication, and that the passage would be surgically corrected if the problem persisted. Def. Ex. A ¶12.

8. A week later, on December 27, 2016, Garibaldi reported a single incidence of water in his nose. Dr. Villasis examined the area and found no swelling or draining and could detect no sinus exposure. However, with Garibaldi's consent, he placed gelfoam with sutures to seal the area. Def. Ex. C at 176. Contrary to Garibaldi's assertion that "the hole was still open" one week later, the medical records indicate that Dr. Villasis re-examined Garibaldi three days after

administering the gelfoam; it was still in place, and Garibaldi registered no complaints of pain. Id.; Def. Ex. A ¶13.

9. Garibaldi's sinus exposure had healed by January 3, 2017, at which time Dr. Villasis removed the sutures. Garibaldi had no complaints, and Dr. Villasis observed no facial swelling, bleeding or sinus exposure. He instructed Garibaldi to complete the antibiotic prescription and to return if any issues arose. Def. Ex. P at 176.

10. On February 8, 2017, Garibaldi was seen by PA Cartwright for a routine check. At that time his nose, sinuses, and oropharynx were assessed as "normal," and he voiced no complaints about the sinus issue. Def. Ex. A §15; Ex. C at 264-69.

11. Dr. Villasis saw Garibaldi again three months later, on April 4, 2017. Garibaldi complained of a runny nose, with pain and water coming from his nose when he blew it. An x-ray revealed no evidence of a sinus tract, and upon examination the tissue was pink, no swelling was present, and no opening could be detected. Dr. Villasis prescribed antibiotics as a precaution and scheduled Garibaldi for a follow-up visit in a week. Def. Ex. A. ¶16; Ex. C at 174.

12. Garibaldi returned a week later, on April 11, 2017. He told Dr. Villasis that he had not taken the antibiotic but was feeling better and doing well. Dr. Villasis examined the area and detected no sinus tract and no sign of infection, and although Garibaldi complained of water getting into his nose when he drank he was unable to reproduce the problem in the clinic. Dr. Villasis offered to suture the area but Garibaldi declined, and Dr. Villasis again prescribed antibiotics as a precaution. Def. Ex. A ¶ 17; Ex. C at 173-74. It was at this visit that Dr. Villasis administered a "numbing agent" as described by Garibaldi; however, he gave Garibaldi a only a single shot of Carbocaine before Garibaldi opted for no treatment, and once that decision was

6

made no further injections or treatment were provided. Def. Ex. A ¶ 18.

13. Garibaldi was seen again by Dr. Villasis on April 18, 2017. There was no sign of infection, swelling or draining, and Garibaldi again declined Dr. Villasis' offer of suturing. Based on Garibaldi's description of his symptoms Dr. Villasis believed a pinpoint simus exposure might be present, and he decided to obtain a second opinion from Dr. Haydu.

14. Dr. Haydu examined Garibaldi the following day and detected a small area of sinus exposure. He spoke with an oral surgeon, and the decision was made to change Garibaldi's antibiotic and to re-evaluate his condition in thirty days. Def. Ex. A ¶20; Ex. B ¶6; Ex. C at 173. Although Garibaldi now claims that during this period he was experiencing jaw pain, a black eye, draining, and dizziness, Am. Compl. §IV at 6, there are no notations in the medical records that he ever voiced any such concerns to a health care provider. Def. Ex. A ¶21; Ex. B ¶9.

15. Garibaldi returned to see Dr. Villasis on May 17, 2017. He reported occasional problems and also revealed that he was not taking his antibiotic consistently because he "didn't think it would help." Dr. Villasis stressed to Garibaldi the importance of taking the antibiotic and again offered him surgical intervention, which Garibaldi refused. Examination revealed no infection or swelling and no reproducible passage of air. Def. Ex. A ¶22; Ex. C at 172.

16. On June 13, 2017, Dr. Villasis reviewed the medication log in preparation for a scheduled appointment with Garibaldi to check his compliance, and noted that Garibaldi had taken only 5 of 47 doses of antibiotics recommended by the oral surgeon; he had refused it 42 times. It was documented that Garibaldi had been counseled twice about the importance of taking the antibiotic to help with sinus closure. Def. Ex. A ¶23; Ex. C at 172. Dr. Villasis saw Garibaldi the following day and discussed with him the importance of compliance; he noted that

7

Garibaldi was rude and combative. Def. Ex. A ¶24; Ex. C at 171.

15. Dr. Villasis saw Garibaldi again on June 23, 2017. At this juncture, despite having been advised multiple times of the beneficial effect of antibiotics in the healing process, records indicated that Garibaldi had refused his antibiotic 87 out of 100 times. Def. Ex. E. Dr. Villasis again counseled Garibaldi regarding the importance of taking antibiotics as prescribed, and Garibaldi was noted to have been confrontational and insulting. There were no signs of drainage, swelling or infection, and for that reason along with Garibaldi's continuing non-compliance, no antibiotic was prescribed. Instead, Dr. Villasis provided anti-inflammatory medication and scheduled Garibaldi for a second opinion visit with Dr. Haydu. Def. Ex. A ¶25; Ex. C at 170.

16. Dr. Haydu saw Garibaldi on June 28, 2017. Garibaldi agreed to take his antibiotics, and the same antibiotic Dr. Villasis had prescribed initially was again provided. Def. Ex. A ¶26; Ex. B ¶ 10; Ex. C at 169.

17. After this, a round-table meeting was held with the Health Services Administrator, Dr. Villasis, Dr. Haydu, and Dr. Jamaludeen, the medical director. Due to Garibaldi's general noncompliance and persistent complaints, the decision was made to send him an oral surgeon. The decision was based on the team's belief that, although conservative treatment is always preferable, under the circumstances in Garibaldi's case surgical intervention likely would provide the best outcome. Def. Ex. B ¶ 11.

18. Dr. Villasis saw Garibaldi on July 14, 2017, to document the decision to send him to an outside oral surgeon, and a request was submitted for approval for the visit. Def. Ex. A ¶ 27; Ex. C at 169.

19. Garibaldi underwent surgical closure of a fistula at the site of his tooth extraction on

July 27, 2017. The surgeon noted that Garibaldi had been noncompliant with his prescribed antibiotics and that he previously had declined surgical intervention. Def. Ex. A ¶28; Ex. B ¶ 12; Ex. C at 19-22. Dr. Villasis continued to follow Garibaldi post-operatively, and by October 27, 2017, the fistula had closed completely with no further problems. Def. Ex. A ¶29; Ex. B ¶ 13; Ex. C at 164. Dr. Haydu saw Garibaldi on two additional occasions, during which Garibaldi voiced no complaints about the tooth extraction site. Def. Ex. B ¶ 14; Ex. C at 181-84, 331-36.

## IV. Analysis

To establish an Eighth Amendment claim for denial of medical care, a plaintiff must show that jail officials were deliberately indifferent to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 105 (1976); Staples v. Va. Dep't of Corr., 904 F.Supp. 487, 492 (E.D.Va. 1995). To establish that poor or inadequate medical treatment rose to the level of a constitutional violation, a plaintiff must show that he suffered "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" by proving two distinct elements. Id. at 105; see also Staples v. Va. Dep't of Corr., 904 F. Supp. 487, 492 (E.D. Va. 1995). First, he must show that he suffered from a sufficiently serious medical need. See, e.g., Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious). Second, he must establish that the defendant was deliberately indifferent to that serious medical need. Under this second prong, mere negligence or even malpractice is not enough to state an Eighth Amendment violation; instead, plaintiff must show that the defendant was deliberately indifferent "by either actual intent or reckless disregard," Estelle, 429 U.S. at 106; Daniels v. Williams, 474 U.S. 327,

328 (1986); Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); that is, that the defendant's actions were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. A prisoner's disagreement with medical personnel over the course of his treatment will not support an Eighth Amendment cause of action. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

A delay in medical treatment may constitute deliberate indifference. See Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (citing Estelle, 429 U.S. at 104-05). A constitutional violation only occurs, however, if the delay results in some "substantial harm" to the patient. Thus, in addition to showing that his medical need was objectively serious, the plaintiff must also establish that the delay in the provision of medical care resulted in an objectively "substantial harm." See Webb v. Hamidullah, 281 Fed. App'x. 159, 166 (4th Cir. 2008) (unpublished decision); Shabazz v. Prison Health Servs., No. 3:10cv190, 2011 WL 2489661, at *6 (E.D. Va. Aug. 9, 2011). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." Shabazz, 2011 WL 2489661, at *6.

It requires little discussion at this juncture to conclude that neither defendant was deliberately indifferent to the serious medical need posed by Garibaldi's infected tooth.[3] Distilled to its essence, plaintiff's claim is that the defendants did not properly address the problems he experienced in connection with the treatment of the tooth, and that he should have been referred to the outside oral surgeon more promptly. The undisputed evidence now before the Court supports neither conclusion.

---

[3]Because the tooth required extraction, and because plaintiff's claim clearly fails on the deliberate indifference component, the Court assumes for purposes of analysis that the condition was sufficiently serious to warrant constitutional protection.

First, there is no indication that either Dr. Villasis or Dr. Haydu was deliberately indifferent to the condition of Garibaldi's infected tooth and subsequent complications. To the contrary, as detailed above, Garibaldi was seen on multiple occasions regarding the tooth and its related conditions, and in every instance his complaints were addressed promptly with assessments, medications, treatments, and ultimately referral to an oral surgeon. There is no evidence whatever that either defendant "knew of and ignored" Garibaldi's need for dental and medical care, and nothing in the record suggests that any action or inaction by either defendant was "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851. To be sure, much of Garibaldi's claim amounts to nothing more than his disagreement with the defendants over the course of his treatment, a situation which has been held repeatedly not to support an Eighth Amendment claim. Wright, 766 F.2d at 849; see also, Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975) (holding that questions of medical judgment are not subject to judicial review). Moreover, to the extent that Garibaldi at times was not receiving medication for his condition, the situation was caused not by any inaction or lack of attention on the part of the defendants, but rather by his own admitted and well-documented decision to stop taking the antibiotics the defendants had prescribed.

Garibaldi's implicit claim that the delay in referring him to an oral surgeon amounted to deliberate indifference fares no better. As the undisputed evidence shows, a period of slightly more than eight months elapsed from December 6, 2016, the date Garibaldi first presented complaining of a tooth infection, and July 27, 2017, the date the oral surgeon closed the fistula that had developed as a complication of the tooth's extraction. During that period, the defendants pursued a conservative course of treatment for Garibaldi's dental issues based on the

belief that such an option is "always preferable," and eventually decided to refer him for outside intervention based in part on Garibaldi's noncompliance with the regimen they prescribed. More importantly, after the oral surgeon closed the fistula, Garibaldi experienced no further problems with respect to the tooth extraction site, and he consequently cannot show that any delay in seeing the oral surgeon resulted in any objectively "substantial harm." Cf. Shabazz, 2011 WL 2489661, at *6. Accordingly, as Garibaldi has failed to establish either that the defendants were deliberately indifferent to his infected tooth or that the delay in treating the tooth caused him to suffer substantial harm, his claim that they violated his Eighth Amendment rights must fail.

## V. Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment will be granted. An appropriate Order and Judgment shall issue.

Entered this 12th day of December 2018.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia